UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
------------------------------------------------------------------------X
ANTHONY PAPAPIETRO,

Plaintiff,   **COMPLAINT**

v.   **3 : C V - 2 2 - 1 6 2 4**

JURY TRIAL DEMANDED

THE BANK OF NEW YORK MELLON f/k/a
THE BANK OF NEW YORK AS SUCCESSOR IN
INTEREST TO JPMORGAN CHASE BANK, N.A.
AS TRUSTEE FOR THE BENEFIT OF THE
CERTIFICATE HOLDERS OF POPULAR ABS, INC.
MORTGAGE PASS-THROUGH CERTIFICATE
SERIES 2005-4, BY ITS ATTORNEY-IN-FACT
OCWEN LOAN SERVICING AND WILMINGTON       **FILED**
FINANCE, A DIVISION OF AMERICAN           **SCRANTON**
INTERNATIONAL GROUP FEDERAL
SAVINGS BANK a/k/a AIG, LITTON LOAN       OCT 1 7 2022
SERVICING, ALEXANDER
PAPADOPOULOS, attorney for MISAIL         Per_____
PAPADOPOULOS and EVANGELIA                    DEPUTY CLERK
PAPADOPOULOS,

Defendants.
------------------------------------------------------------------------X

**COMPLAINT**

Plaintiff sets forth this Complaint (the "Complaint") against above captioned Defendants, allege

as follows:

**JURISDICTION AND VENUE**

1.  The Plaintiff, Anthony Papapietro is a resident of Pennsylvania residing at 413 Edgemont

    Road, Stroudsburg, Pennsylvania 18360.

<u>Defendants</u>

2.  BANK OF NEW YORK MELLON f/k/a THE BANK OF NEW YORK, as successor in

interest to JPMORGAN CHASE BANK, N.A., as Trustee for the benefit of the

Certificateholders of Popular ABS, Inc. Mortgage Pass-Through Certificates Series 2005-4, by its Attorney-in-fact Ocwen Loan Servicing LLC., 1661 Worthington Road, Suite 100, West Palm Beach, Fl 33409.

3.   WILMINGTON FINANCE, a Division of American International Group Federal Savings Bank a/k/a AIG, Corporate Headquarters located at 1271 Avenue of the Americas, Fl 37, New York, New York 10020.

5.   LITTON LOAN SERVICING is foreign limited partnership located at 4828 Loop Center Drive, Houston, Texas 77081-2226, with their Registered Agent for Service of process being Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

6.   ALEXANDER PAPADOPOULOS, ℅ MISAIL PAPADOPOULOS and EVANGELIA PAPADOPOULOS, 2113 Sutton Road, Strasbourg, PA 18360.

7.   Jurisdiction is proper under 28 USC § 1332.

8.   Jurisdiction is also proper under 28 USC § 1331 in that one of the counts herein involves federal question.

9.   Venue is also proper in this district under 28 USC § 1391 (b)(3) in that the Defendants regularly conducts business in this district and the named plaintiff resides in this district.

10.  The amount in controversy exceeds $75,000.00.

## FACTS

11. At all times herein, Plaintiff is the owner and operator of Rocco's Landscaping and Concrete Service, LLC.

12. Plaintiff is a "consumer" within the definition of the Fair Debt Collections Practices Act (the "FDCPA").

13. POPULAR is a "debt collector" pursuant to § 1692a(6)(F)(iii) as it was a non-originating debt holder that acquired the debt in default or has treated the debt as if it were in the default at the time of the acquisition.

14. LITTON is a "debt collector" pursuant to §1692a(6)(F)(iii) as it was a non-originating debt holder that acquired the debt in default or has treated the debt as if it were in default at the time of acquisition.

15. OCWEN is a "debt collector" pursuant to §1692a(6)(F)(iii) as it was a non-originating debt holder that acquired the in default or has treated the debt as if it were in default at the time of acquisition.

16. On or about June 20, 2005, Plaintiff, ANTHONY PAPAPIETRO and his father, ROCCO PAPAIETRO, now deceased as of July 13, 2014, executed a deed to secure a mortgage debt to Wilmington Finance through American International Group Federal Bank a/k/a AIG.

17. THE BANK OF NEW YORK, as successor in interest to JPMORGAN CHASE BANK, N.A. as Trustee of the benefit of the Certificate holders of POPULAR ABS, Inc. Mortgage Pass-Through Certificate Series 2005-4, by its Attorney-in-Fact OCWEN LOAN SERVICING, LLC. (hereinafter THE BANK OF NEW YORK), has currently filed a Mortgage Foreclosure Action on the subject property, 413 Edgemont Road, Stroudsburg, Pennsylvania, in the Court of Common Pleas, Monroe County, Pennsylvania, and is scheduled for a Sheriff's Sale on December 1, 2022.  (*See Exhibit 1 - The Mortgage Foreclosure Action* ).

18. The Plaintiff, ANTHONY PAPAPIETRO, has been injured and has suffered damages due to the fraudulent and continued actions by the Defendants herein, concluding in a Mortgage Foreclosure Action for the subject property, 413 Edgemont Road, Stroudsburg, Pennsylvania.

19.  The Defendant, ROCCO PAPAPIETRO, in the said Mortgage Foreclosure Proceeding has been deceased since July 13, 2014 . (*See Exhibit 2 - The Death Certificate of Rocco Papapietro*).  The interest of ROCCO PAPAPIETRO's Estate has never been properly served in this action.

## JPMORGAN CHASE BANK, N.A.

20.  JPMORGAN CHASE BANK, N.A., has been involved in numerous lawsuits over the years (probably thousands), alleging misconduct, illegal trading, and deceptive practices with mortgages, among other misbehavior.  See,  *United States vs. JPMorgan Chase Bank N.A. (S.D.N.Y. - 2017); United States vs. JPMorgan Chase Bank, N.A. (S.D.N.Y. - 2013).*  By placing mortgages in pools and having Servicing Companies (middlemen) handle the loans and continue the fraud and deceptive practices.

## THE BANK OF NEW YORK

21.  Similar to JPMORGAN CHASE BANK, N.A, it is well known that THE BANK OF NEW YORK, has also been involved in numerous lawsuits and made to pay billions in fines to homeowners and to the United States Government, for using the same deceptive practices and fraud involving mortgages.  *See, United States vs. The Bank of New York Mellon* 1:2011-cv-06969.  The list of cases is endless.

22.  These Banks and Servicing Companies have been penalized by the United States Government for billions of dollars.  These practices on mortgages lack a legitimate chain of ownership and have broken the nation's property system.

WILMINGTON FINANCE

23. On or about June 20, 2005, Plaintiff executed a deed to secure a debt to WILMINGTON FINANCE, a division of AIG Federal Savings Bank conveying a security interest in his home at 413 Edgemont Road, Stroudsburg, Pennsylvania 18360. *(See Exhibit 3 - Mortgage Note).*

24. On the same date, June 20, 2005, Plaintiff's executed a promissory note to WILMINGTON FINANCE, a division of AIG Federal Savings Bank, in the amount of $405,600. The interest rate was 7.713%. *(See Exhibit 4 - Truth in Lending Disclosure Statement).*

25. On or about August 2005, Plaintiff's began making timely monthly payments by check in the amount of $2,836.01.

POPULAR MORTGAGE SERVICING COMPANY

26. POPULAR is the non-originating debt holder of the Original Note held by WILMINGTON FINANCE.

27. On August 16, 2005, POPULAR began adding late charges in the amount of $141.80 to the August 2005, September 2005, October 2005, November 2005 and December 2005 statements although the payments were timely. *(See Exhibit 5 - Transaction History and Billing Statement).*

28. POPULAR sent correspondence dated November 18, 2005 and November 19, 2005, stating that the account was past due in the amount of $2,836.01 and $2,977.81, respectively.

29. In addition to the late notices, on October 28, 2005, POPULAR sent a letter to the Plaintiff's stating that they did not have proof of insurance on the property. *(See Exhibit 6 - October 28, 2005 Letter).*

30. Plaintiffs furnished proof of current insurance from Metlife covering June 20, 2005 through June 20, 2006. *(See Exhibit 7 - Metlife Proof of Insurance).*

31. POPULAR sent Plaintiff's another letter on August 15, 2006, requesting proof of insurance.

32. Plaintiffs again furnish proof of insurance from Allstate covering June 23, 2006 through June 23 2007.

33. Plaintiff then received a letter on September 14, 2006 stating that the property taxes are delinquent.

34. On October 11, 2006 and November 10, 2006, the Plaintiffs received two letters requesting proof of insurance again stating that the insurance would be purchased for the property.

35. On October 17, 2006, POPULAR sent a letter stating that the taxes on the property were delinquent and proof was needed that the taxes were paid.

36. Plaintiffs faxed a copy of the tax bill stating taxes were due on December 31, 2006 and the receipts showing all taxes were paid on or before the 31st day of December, 2006.

37. POPULAR continued to add late fees in January 2006 and February 2006 and reported the alleged delinquencies to the credit bureaus.

38. After several attempts to correct the error, Plaintiff's received a letter on March 4, 2006 that POPULAR would correct the error and show November 2005 as current with the credit bureaus.

39. Payments were being placed in a forbearance suspense account to cover the escrow balance due to the disbursed insurance and taxes.  Payments were placed in a forbearance account in March 2007, May 2007, June 2007, July 2007, August 2007, September 2007,

October 2007, November 2007, December 2007, January 2008, February 2008, March 2008, April 2008, May 2008, June 2008, July 2008, August 2008 and October 2008. *(See Exhibit 5 - Transaction History and Billing Statements).*

40. Plaintiffs received more late fees in April 2006, June 2006, July 2006, August 2006, October 2006, November 2006, January 2007, February 2007, March 2007, May 2007, June 2007, July 2007, August 2007, September 2007, October 2007, November 2007, December 2007, January 2008, March 2008, April 2008, May 2008, June 2008, July 2008 and August 2008.

41. On December 12, 2006, POPULAR placed insurance on the property which was billed to the Plaintiff in the amount of $6,621.78. ( *See Exhibit 5 - Transaction History and Billing Statements).*

42. Plaintiffs again sent proof of insurance from Allstate effective June 23, 2006 to June 23, 2007.

43. On March 6, 2007, POPULAR refunded the insurance premium to the Plaintiff's account, but no adjustments were made to the late fees charged or payments placed in escrow.

44. On March 13, 2007, POPULAR charged Plaintiffs' escrow account $9,054.03 for taxes that Plaintiff paid on December 31, 2006.

45. POPULAR failed to apply a payment written on June 4, 2007 and cashed on June 21, 2007 to the Plaintiffs' account.  Plaintiffs were sent a blank monthly statement and the next month statement did not reflect the June 2007 payment.  *(See Exhibit 5 - June 2007 Statement).*

46.  On January 25, 2008, Plaintiff received correspondence from Defendant, POPULAR, stating that they put in a request to all three (3) credit agencies to show that Plaintiff was "current from August 31, 2007" and apologized for the inconvenience.  *(See Exhibit 8 - January 25, 2008 Letter from Popular).*

47. On April 15, 2008, Plaintiffs received a letter from POPULAR stating that the mortgage loan was delinquent in the amount of $11,682.88.

48. On April 17, 2008, two days later, Plaintiffs received a letter from POPULAR stating that the mortgage loan was delinquent in the amount of $9,252.28.

49. On April 22, 2008, five days later, Plaintiffs received a letter from POPULAR stating that the mortgage loan was delinquent in the amount of $7,198.54.

50. On June 17 2008, Plaintiffs received a letter from POPULAR stating that the mortgage loan was delinquent in the amount of $9,252.28

51. On June 23, 2008, Plaintiffs received correspondence from POPULAR that once again insurance proof was needed.  Plaintiffs once again provided proof of insurance from Allstate effective June 23, 2008 through June 23, 2009.  *(See Exhibit 9 - June 23, 2008 Letter).*

52. On July 2, 2008, Plaintiffs wrote a letter to the Federal Trade Commission setting forth the errors of POPULAR and the failure to correct the errors requesting assistance to fix his credit.

53. On July 10, 2008. Plaintiffs were contacted by a "Shaliya Teacher" from POPULAR, stating that payments for May, June and July were not received.

54. In response to that phone call, Plaintiff, ANTHONY PAPAPIETRO faxed a letter to a "Gina Minor" at POPULAR on July 11, 2008, sending proof of payment for the alleged delinquent months.

55. Plaintiffs received another letter on July 15, 2008, stating that formal foreclosure proceedings would be started in three (3) business days due to the delinquency.  *(See Exhibit 10 - July 15, 2008 Letter).*

56. On July 18, 2008, Plaintiffs received a letter stating that the insurance premium was going to be refunded to the account as proof of insurance was received.  However, a month later, on August 12, 2008, Plaintiffs received another letter stating that the insurance was not current on the property and insurance was placed on the property by POPULAR the same day.  Plaintiff was charged $7,789.80. *(See Exhibit 11 - July 18, 2008 Letter, August 12, 2008 Letter and Proof of Insurance).*

57. On August 12, 2008, Plaintiffs again sent proof of payments to POPULAR for the months of May, June and July 2008, attempting to correct the error on their account.  Plaintiffs sent copies of the letter and proof of payments to the New York State Attorney General in an attempt to hasten a resolution.

58. On August 19, 2008, Plaintiffs sent a fax to POPULAR providing proof of insurance from Allstate covering June 23, 2008 to June 23, 2009.  *(See Exhibit 12 - Proof of Allstate Insurance).*

59. Plaintiffs received another letter from POPULAR on September 5, 2008, stating that the account was not current as of June 2008 and once again, copies of the checks were needed to correct the error.

60. Plaintiffs responded on September 10, 2008 and sent POPULAR copies of the May 2008, June 2008, and July 2008 checks cashed by POPULAR.  Plaintiffs sent copies of the letter to the New York Attorney General and the Pennsylvania Secretary of Banks.

61. On September 11, 2008, Plaintiffs received another letter requesting proof of insurance. On that same date, Plaintiffs wrote letters to the three credit bureaus, Equifax, Experion and TransUnion requesting that the errors of POPULAR be corrected.  Plaintiffs furnished each bureau with proof of payments.

62. On September 15, 2008, Plaintiffs again sent proof of payment for the months of May, June and July.  Plaintiffs sent a copy of the letter to the New York Attorney General and the Pennsylvania Secretary of Banks.

63. On September 23, 2008, TransUnion responded to the Plaintiffs' request for a correction of his credit report stating that the delinquencies were verified by the creditor as accurate and there would be no change on his credit report.

64. On September 23, 2008, Plaintiffs were copied on a letter sent from POPULAR to the New York State Attorney General in response to the letters sent by the Plaintiff.  POPULAR contends that the payments were not being accepted because the escrow account was being shorted because delinquent taxes had to be paid POPULAR combined two payments to satisfy the payment for one month.  *(See Exhibit 13 - September  23, 2008 Letter).*

65. On September 29, 2008, POPULAR sent a letter stating that the force placed insurance premiums would be refunded to the account as proof of current was sent.

66. On October 2, 2008, Plaintiffs received correspondence from the New York Attorney General stating that POPULAR refused to make any refunds or adjustments and that a court is the only forum in which rights will be determined.

67. On October 3, 2008, Plaintiffs again wrote letters to POPULAR and the three (3) credit bureaus, Equifax, Experion and TransUnion, to correct the errors on his credit report.  This correspondence lists Plaintiff, ANTHONY PAPAPIETRO's mortgage payments from January 2008 through July 2008 and contains the checks that were cashed:

    -January payment - check #1605 dated 1/3/08, cashed 1/24/08 (cashed 21 days later);

    -February payment - check #1669 dated 2/10/08, cashed 2/22/08 (12 days later);

    -March payment - check #1718 dated 3/7/08, cashed 3/19/08 (12 days later);

-April payment - check #1794 dated 4/9/08 cashed 4/23/08 (14 days later);

-May payment - check #1861 dated 4/30/08 cashed 5/20/08 (20 days later);

-June payment - check #1927 dated 6/4/08 cashed 6/17/08 (14 days later);

-July payment - check #2013 dated 7/11/08 cashed 7/17/08 (5 days later).

*See Exhibit 14  - October 3, 2008 Letter.*

68. On October 7, 2008, the Pennsylvania Department of Banking required a response to the Plaintiffs' complaints from POPULAR by November 6, 2008.

69. On October 17, 2008, POPULAR sent Plaintiffs a letter stating that the account was overdue in the amount of $19,976.42.

70. On October 20, 2008, the Plaintiffs were copied on the response from POPULAR to the Pennsylvania Department of Banking.  POPULAR now contends that the payments were not being accepted because the Plaintiffs failed to pay for the force placed insurance and the payments were being placed in a suspense account until there was enough money to make a full payment or cure the default.  Additionally, POPULAR noted that the Plaintiffs' loan was being sold to LITTON LOAN SERVICING, effective November 1, 2008. *(See Exhibit 15 - October 20, 2008 Letter).*

71. On October 22, 2008, the Pennsylvania Department of Banking forwarded the response they received from POPULAR stating that the late payments were due for the force placed insurance.

72. Although Plaintiffs received correspondence on September 29, 2008, that the force placed insurance was being refunded, Plaintiffs sent proof of insurance from Allstate effective June 23, 2008 to June 23, 2009 again to show that there was current insurance on the property.

11

## POPULAR

73. During the servicing of POPULAR. Plaintiffs' mortgage account was charged a late fee twenty-seven (27) times for a total of $3,828.60.

74. Plaintiff's escrow account was charged for the taxes on March 13, 2007, in the amount of $9,054.03, which were previously paid by the Plaintiff on December 3, 2006.

75. Plaintiff's mortgage account was charged for forced placed insurance on December 12, 2006, which was eventually refunded to the account on March 6, 2007 and then charged again on August 12, 2008, which was refunded on September 29, 2008, however, no adjustments were made to late fees charged and the funds placed in escrow when the account was charged for the insurance

76. Plaintiff's June 4, 2007 mortgage payment was not credited or applied to the account.

77. POPULAR reported delinquencies to all three credit bureaus for thirteen (13) months from October 2007 to October 2008.

78. At the end of POPULAR's servicing of the Plaintiff's mortgage account, the principal balance due was $393,864.31, $20,573.60 due in escrow, $2,900.65 in suspense and $3,828.60 in late fees.

79. The only payments made by POPULAR on the Plaintiff's behalf were taxes totaling $11,091.51, made on 7/31/07 for town taxes in the amount of $1,701.63, $7,688.25 on 8/9/07 for school taxes, and $1,701.63 on 5/1/08 for town taxes.

80. Plaintiffs made monthly payments in total of: $110,604.39 of which $17,295.87 was interest.

12

## LITTON LOAN SERVICING, LP.

81. On or about October 10, 2008, Plaintiff received correspondence that the servicing of his mortgage loan was being transferred to LITTON LOAN SERVICING, LP, effective November 1, 2008. *(See Exhibit 16 - October 10, 2008 Letter).*

82. On November 13, 2008, LITTON sent the Plaintiff a letter stating that the current amount of debt on the account due was $428,237.43 which included principal, interest, negative escrow and service fees.

83. On December 16, 2008, forty-six days after the mortgage was transferred, LITTON imposed a late fee of $141.80, which is less than 60-days during the transfer period. *(See Exhibit 5 - Transaction History).*

84. Plaintiff's first billing statement stated that the account's principal balance was $393,489.95; escrow balance $17,786.95; late charges $3,403.20; and other fees due $10.50. *(See Exhibit 5 - Billing Statements).*

85. Plaintiff responded on December 11, 2008 via fax to LITTON, sending proof of insurance from Allstate Insurance Company effective June 23, 2008 to June 23, 2009 and proof of payment for the months of August 2008, September 2008, and October 2008. On December 31, 2008, LITTON acknowledged that insurance records were updated and payments were received. The letter indicated that the payments were combined and balances were put in suspense account to complete previous installments of $4,626.14.

86. On February 27, 2009, LITTON sent Plaintiff a package requesting documentation for the Homeowner Affordability and Stability Program. Plaintiff sent all requested documents to be considered for the new program.

13

87.  On March 6, 2009, Plaintiff sent LITTON a thirteen (13) page fax which included financial information, December 2008 and January 2009 bank statements.

88.  On September 3, 2009, LITTON sent a letter stating that the escrow account has been charged $3,575.00 because they have not received acceptable evidence of the continuous insurance. *(See Exhibit 17 - September 3, 2009 Letter and Proof of Insurance from June 23, 2008 to June 23, 2009).*

89.  On September 14, 2009, Plaintiff sent proof of insurance from State Farm effective July 1, 2009 to July 1, 2010.

90. On October 24, 2009, LITTON offered Plaintiff a TPP Agreement entitled Home Affordable Modification Trial Period Plan.  ("Trial Period Plan" or "TPP").

91.  On November 23, 2009, Plaintiff sent LITTON proof of payment of taxes that were said to be outstanding, and the cause of the escrow account being established during the servicing of POPULAR.

92.  On or about November 23, 2009, the Plaintiff timely accepted the offer by executing the TPP Agreement and returning it to LITTON, along with the completed Hardship Affidavit, IRS Form 4506-T, other supporting documentation, and the first TPP payment of $1,550.04.

93.  The TPP Agreement provided that the plan was effective November 7, 2009 and would run from December 1, 2009 to February 1, 2010.  The monthly mortgage payments were $1,550.04 under the TPP Agreement. *(See Exhibit 18 - TPP Agreement).*

94. The first sentence of the TPP Agreement provides:

if representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification

Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property and (2) the Note Secured by the Mortgage."

95.  Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE under this Plan" and defines the "Modification Effective Date" for the permanent HAMP modification as "the first day of the month following the month in which the last Trial Period Payment is due."

96.  Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

97.  Plaintiff timely made each of the payments as set forth of the TPP Agreement due in December 2009, January 2010, and February 2010. *(See Exhibit 19 - Proof of Trial Period Payments).*

98.  Plaintiff was in compliance with the TPP Agreement and their representation to LITTON continued to be true in all material respects. Plaintiff was directed to make another payment of $1,550.04 in March 2010. *(See Exhibit 5 - March 2010  Billing Statement).*

99.  Despite having previously provided LITTON with all documentation requested, LITTON did not provide the Plaintiff with a permanent loan modification under the HAMP guidelines by the end of the trial period or after the additional payment in March 2010.

100.  On June 26, 2009, Plaintiff wrote a letter to Richard Grossi, Esq. of LITTON explaining the errors of POPULAR requesting a review of the account and a correction of his credit report.

101.  On August 19, 2009, Plaintiff hired an attorney, Ms. Nora Hart, to take over the day to day communication with LITTON regarding the negative credit reporting and the servicing of the mortgage.

102.  In order to expand Plaintiff's business, Rocco's Landscaping and Concrete,  Plaintiff needed to apply for a credit line increase.  On October 22, 2009, Bank of America denied Plaintiff's application for credit due to the delinquencies on his credit report by POPULAR and LITTON. *(See Exhibit 20 - October 22, 2009 Letter).*

103.  On January 29, 2010, as part of the required modification documents, Plaintiff, Anthony Papapietro, faxed LITTON a copy of his January through December 2009 Profit and Loss statement for his business due to the fact that he did not have a personal tax return.

104.  In April 2010 through April 2011, Plaintiff continued to receive statements in the amount of $4,626.14 with late charges of $2,981.74 and other fees due in the amount of $57.00. *(See Exhibit 5 - April 2010 Statement).*

105.  From April 2010 through April 2011, Plaintiff continued to receive statements in the amount of $4,626.14 with varying late fees and other fees due.

106.  On May 3, 2010, LITTON sent another request for documentation to proceed with the request for modification.  LITTON requested a Completed and signed Request for Modification and Affidavit (RMA) or Hardship Affidavit form and a Signed copy of the most recently filed federal income tax return including all schedules and forms.

107.  On May 4, 2010, Plaintiff's attorney filed a Summons and Complaint against POPULAR and its successors and/or assigns for forced placed insurance during the time POPULAR was servicing the mortgage.  Plaintiff's attorney withdrew the Complaint to pursue a class action suit in the future.

108.  On May 5, 2010, LITTON sent Plaintiff a letter stating that a permanent modification could not be offered because all documents requested were not received, although Plaintiff sent all documents requested by Defendant.

109. On May 10, 2010, LITTON sent Plaintiff an Act 91 Notice stating that there was a past due balance of $66,789.07 which included $1,880.11 in late charges, $95.00 for a Broker's Price Opinion fee and $57.00 in inspection fees.

110. On May 20, 2010, Plaintiff responded to the Act 91 Notice with a Home Affordable Modification Program Hardship Affidavit and another copy of the requested financial documents.

111. On May 21, 2010, Plaintiff sent LITTON a copy of the signed second page of his 2009 Federal Tax Returns.

112. On August 17, 2010, Plaintiff, was denied credit by Ford Credit due to the reported delinquencies on his credit report.  Plaintiff was once again unable to expand his business due to the negative credit reports.  *(See Exhibit 21 - August 17, 2010 Letter).*

113. On March 3, 2011, LITTON sent Plaintiff a letter stating that the escrow account has been charged $3,546.00 because they have not received acceptable evidence of continuous insurance. *(See Exhibit 22 - March 3, 2011 Letter).*

114. Plaintiff provided proof of insurance from State Farm effective July 1, 2010 to July 1, 2011. *(See Exhibit 23 - State Farm Insurance Proof of Insurance).*

115. On April 12, 2011, Plaintiff received a letter from LITTON stating that the request for the modification would not proceed because a Letter of Explanation (Plaintiff was to call to find out the subject of explanation) and a copy of the most recent quarterly or year-to-date profit/loss statement for all businesses were allegedly not received.

116. On April 20, 2011, Plaintiff's April 14, 2011 mortgage payment in the amount of $1,550.04 was returned by LandSafe Servicing Company because the payment was not payable to the company.

117.  On May 20, 2011, Plaintiff's April 25, 2011 mortgage payment in the amount of $1,550.00 was returned by LandSafe Servicing Company because the account number was said not to be valid.

118.  On June 16, 2011, LITTON sent Plaintiff another Act 91 Notice. Plaintiff responded again by registered mail with a Home Affordable Modification Program Hardship Affidavit and a copy of their financials.

119.  On August 12, 2011, Plaintiff wrote a letter to POPULAR requesting an accounting of the mortgage account when it was being serviced by POPULAR.

120.  On August 12, 2011, Plaintiff also wrote letters to Equifax, TransUnion, and Experion requesting a correction of his credit report in connection with POPULAR and LITTON.

121.  On August 15, 2011, LITTON sent Plaintiff a letter notifying of a service transfer to OCWEN effective September 1, 2011.

122.  On August 18, 2011, POPULAR responded to the request for an accounting of the mortgage account, stating that a legal subpoena was required for the records requested.

123.  On August 25, 2011, LITTON returned Plaintiff's August payment stating that the loan is currently in foreclosure and a payment of $1,550.64 is not enough to pay the total amount due on the loan. *(See Exhibit 24 - August 25, 2011 Letter).*

## LITTON

124.  During the servicing of LITTON, Plaintiff's mortgage account was charged a late fee twenty-three (23) times for a total of $3,261.40

125.  Plaintiff's mortgage account was charged $347.00 in unauthorized miscellaneous fees as follows:

1.      03/18/09 - $9.00 - Drive by inspection

2.      05/22/09 - $10.50 - Drive by inspection

3.      08/04/09 - $9.00 - Drive by inspection

4.      10/13/09 - $9.00 - Drive by inspection

5.      12/10/09 - $10.50- Drive by inspection

6.      12/31/09 - $15.00 - Borr Auth Electronic

7.      02/06/10 - $9.00 - Drive by inspection

8.      04/24/10 - $95.00 - Valuation Costs/Exterior BPO

9.      05/11/10 - $10.00 - Property Services Inspection/Occupancy Inspection

10.     07/13/10 - $10.00 - Property Services Inspection/Occupancy Inspection

11.     09/08/10 - $10.00 - Property Services Inspection/Occupancy Inspection

12.     11/09/10 - $10.00 - Property Services Inspection/Occupancy Inspection

13.     12/15/10 - $10.00 - Property Services Inspection/Occupancy Inspection

14.     03/22/11 - $10.00 - Property Services Inspection/Occupancy Inspection

15.     05/17/11 - $10.00 - Property Services Inspection/Occupancy Inspection

16.     05/21/11 - $90.00 - Valuation Costs/Exterior BPO

17.     07/27/11 - $10.00 - Property Services Inspection/Occupancy Inspection

126.  Plaintiff's mortgage account was charged for forced placed insurance on August 27, 2009 in the amount of $3,570.00 which was eventually refunded to the account on September 17, 2009 in the amount of $3,315.81; however no adjustments were made to the escrow account or late fees charged.

127.  Plaintiff's mortgage account was charged again for forced placed insurance on February 24, 2011 in the amount of $3,546.00 which was not refunded to the account even after proof of insurance was provided.

128.  LITTON breached the provision of the TPP Agreement that compliance with the TPP Agreement for the three-month trial period would result in a permanent loan modification.

129.  LITTON reported delinquencies to all three credit bureaus twenty (20) months from May 2009 to July 2011.

130.  At the end of LITTON's servicing of the Plaintiff's mortgage account, the principal balance due was $389,214.33, $35,616.61 due in escrow, $3,148.61 in suspense and $955.00 in fees

131.  The only payments made by LITTON on the Plaintiff's behalf were taxes totaling $22,722.77, made on 7/17/09 for town taxes in the amount of $2,031.65, $9,000.04 on 9/15/09 for school taxes, $9,658.41 on 8/30/10 for school taxes and $2,032.67 on 3/23/11 for town taxes.

132.  Plaintiff made twenty-nine (29) payments totaling $84,914.36.

## OCWEN LOAN SERVICING COMPANY

133.  On September 1, 2011, OCWEN was assigned as the mortgage servicing company for the Plaintiff's loan.

134.  On October 14, 2011, Plaintiff wrote a letter to the Federal Trade Commission requesting assistance with LITTON and his credit report.

135.  On October 16, 2011, OCWEN sent Plaintiff a letter stating that they do not have proof of insurance on the property. On the same date, insurance was charged to escrow in the amount of $3,273.00.  *(See Exhibit 25 - October 16, 2011 Letter).*

136.  On October 17, 2011, Plaintiff wrote a letter to OCWEN and sent a copy of the homeowners insurance from Allied Insurance.

137.  On October 17, 2011, OCWEN returned Plaintiff's September 14, 2011 payment in the amount of $1550.64 stating that they are unable to accept it for the account indicated because it

is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun.  (See Exhibit 26 - Letters from Ocwen Returning Payments - September 17, 2011 through August 7, 2012).

138.  On October 21, 2011, in accord with RESPA § 6, Plaintiff sent POPULAR a "Qualified Written Request" letter requesting the accounting information previously requested. *(See Exhibit 27 - October 21, 2011 Letter).*

139.  On October 26, 2011, OCWEN returned Plaintiff's October 6, 2011 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun.  (See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 through August 7, 2012).

140.  On October 31, 2011, OCWEN returned Plaintiff's October 13, 2011 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun. (See Exhibit 26  - Letters from Ocwen returning payments  - September 17, 2011 thru August 7, 2012).

141.  On November 2, 2011, Plaintiff wrote a letter to the Federal Trade Commission requesting assistance with their mortgage, explaining the previous issues with POPULAR, LITTON and OCWEN's refusal to accept their mortgage payments.

142.  On November 3, 2011, OCWEN returned Plaintiff's October 20, 2011 payment in the amount of $1,550.59 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun.  *(See Exhibit 26 - Letters  from Ocwen returning payments - September 17, 2011 thru August 7, 2012).*

143.  On November 16, 2011, OCWEN returned Plaintiff's November 1, 2011 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun.  *(See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 through August 7, 2012).*

144.  On November 23, 2011, OCWEN returned two of Plaintiff's payments both dated November 7, 2011 each in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan. Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun.  *(See Exhibit 26 - Letters from Ocwen returning payments September 17, 2011 through August 7, 2012).*

145.  On December 2, 2011, OCWEN returned Plaintiff's November 14, 2011 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure

proceedings that have begun. (See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 thru August 7, 2012).

146.  On December 21, 2011, Plaintiff wrote a letter to OCWEN requesting a transaction history of the mortgage from the inception in 2005 up until the date of the letter.

147.  On December 27, 2011, the Department of Treasury responded to Plaintiff's letter informing them that their case had to be escalated to the Homeowner's Affordable Modification Program (HAMP) Solutions Center.

148.  On January 3, 2012, OCWEN sent Plaintiff a letter confirming the receipt of the request for the history of the loan.

149.  On January 5, 2012, OCWEN returned Plaintiff's December 14, 2011, payment in the amount of $1,619.33 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun. *(See Exhibit 26 - Letters  from Ocwen returning payments - September 17, 2011 thru August 7, 2012).*

150.  On January 19, 2012, Urden Law Offices, counsel for OCWEN, sent Plaintiff a Notice of Default and Intention to Take Action.  Plaintiff was instructed to make a payment of $142,725.93, which included all accrued late charges, costs and attorney's fees incurred to date. *(See Exhibit 28 - January 19, 2012 Letter).*

151.  On January 23, 2012, Plaintiff responded to Notice of Default and Intention to Take Action by explaining that monthly payments were made to OCWEN and each and every payment made was returned.

152. On February 7, 2012, OCWEN returned Plaintiff's January 15, 2012 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun. *(See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 thru August 7, 2012).*

153. On February 26, 2012, Plaintiff received an email from OCWEN acknowledging receipt of a payment dated February 23, 2012 in the amount of $1,550.04.

154. On March 29, 2012, OCWEN returned Plaintiff's March 14, 2012 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun. *(See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 thru August 7, 2012).*

155. On May 22, 2012, Plaintiff received a Notice of Intention to Foreclose Mortgage (Act 6 Notice) from Stern & Eisenberg, PC stating that in order to cure the default on the loan, Plaintiff must pay $161,680.85 within thirty (30) days.     *(See Exhibit 29 - May 22, 2012 Letter)*

156. On June 20, 2012, OCWEN sent Plaintiff a letter responding to the request for the prior servicer payment history and an explanation as to why payments were not being accepted. OCWEN provided Plaintiff with the prior servicer payment history and contended that on May 1, 2012, foreclosure proceedings were initiated and during active foreclosure, uncertified funds and funds that are not the full reinstatement amount would be returned to the remitter.     *(See Exhibit 30 - June 20, 2012 Letter and Transaction History)*

24

157. On August 7, 2012, OCWEN returned Plaintiff's July 15, 2012 payment in the amount of $1,550.04 stating that they are unable to accept it for the account indicated because it is not sufficient to satisfy the defaulted amount on the loan.  Plaintiff was instructed to pay the full amount due as any payments less than would be returned and will not stop any foreclosure proceedings that have begun. (See Exhibit 26 - Letters from Ocwen returning payments - September 17, 2011 thru August 7, 2012).

158. On August 27, 2012, Plaintiff responded to the Notice Of Intention to Foreclose Mortgage letter from Stern & Eisenberg, PC stating that forced placed insurance among other fees put the mortgage account in this position and if he could participate in the HAMP program he would be willing to participate.

159. On September 4, 2012, Plaintiff received an email from 1st Alliance stating that they may qualify for a new Federal Housing Administration loan program with fixed interest rate loan with payments they could afford.

160. On January 4 and January 7, 2013, Plaintiff, Anthony Papapietro, was denied credit by Northfield Bank and TD Bank, respectively due to the delinquencies reported on the Plaintiff'ss credit report.  Plaintiff was sent a copy of his credit report and the only delinquencies reported were from POPULAR, LITTON, and OCWEN.    (*See Exhibit 31 - January 4, 2013 and January 7, 2013 Letters).*

161. On February 8, 2013, Plaintiff sent OCWEN a qualified written request under the RESPA 12 U.S.C 2605(e), certified mail, requesting a detailed account of the mortgage transactions.  OCWEN did not respond to the request.  *(See Exhibit 32 - February 8, 2013 Letter).*

## OCWEN SUMMARY

162.  During the servicing of OCWEN, Plaintiff's mortgage account was charged five (5) late fees from 11/1/11 through 6/1/12.

163.  Plaintiff's mortgage account was charged for forced placed insurance on October 16, 2011 in the amount of $3,273.00 which was not refunded to the Plaintiff's account.

164.  As of 6/1/12, Plaintiff made payments totaling $18,671.34 of which $17,121.30 was returned.

165.  Plaintiff's mortgage account was charged $2,118.50 in unauthorized miscellaneous fees as follows:

1.   09/12/11 - $10.50 - Property Inspection Fee

2.   10/07/11 - $292.00 - Property Valuation Expense

3.   11/03/11 - $300.00 - Title Report

4.   11/13/11 - $10.50 - Property Inspection Fee

5.   01/18/12 - $10.50- Property Inspection Fee

6.   02/29/12 - $7.00 - Service of Process

7.   02/29/12 - $50.00 - Demand Letter

8.   02/29/12 - $825.00 - FC Thru Judgment

9.   02/29/12 - $292.00 - Property Valuation Expense

10.   03/26/12 - $10.50 - Property Inspection Fee

11.   05/16/12 - $10.50 - Property Inspection Fee

12.   05/16/12 - $300.00 - Title Report Fee

166.  OCWEN failed to provide Plaintiff with the response within thirty (30) days to the Qualified Written Requests sent on 10/21/11 and 2/8/13 according to RESPA 12 U.S.C § 2605.

Plaintiff spent a considerable amount of time away from his employment while preparing correspondence and making phone calls to OCWEN to figure out the current status of the mortgage.  Plaintiff had to search through years of transactions attempting to figure out the status of his loan beyond 6/1/12.

## COUNT ONE: VIOLATIONS OF THE FDCPA

167.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

168.  Defendants violated the FDCPA 15 U.S.C. § 1692 d, e and f by its conduct, including but not limited to:

(a)  Attempting to collect amounts not permitted by law (15 U.S.C.§1692f(1));

(b)  Using unfair and unconscionable collection methods (15 U.S.C.§1692f);

(c)  Giving a false impression of the character, amount or legal status of the alleged debt (15 U.S.C. §1692e(2));

(d)  Using false or deceptive collection methods (15 U.S.C.§1692e(5))

(e)  Failing to state "the amount of the debt" as required by 15 U.S.C. §1692g(a)(1)

(f)  Engaging in conduct the natural consequence of which is to harass, oppress or abuse borrowers (15 U.S.C.§1692d)

(g)  Charging for unauthorized forced –placed insurance, despite knowing the property is already insured.

169.  That as a direct and proximate cause of the false, misleading, and deceptive practices, Plaintiff have suffered severe and extreme emotional distress, have not been able to expand their business or to gain access to financial assets because of the negative reports to the credit bureaus,

and incurred attorney fees for which Plaintiff seek actual damages in the amount of $375,000, in addition to additional damages in the amount of $1,000.

WHEREFORE, Plaintiff respectfully request that judgment be entered in favor of the Plaintiff and against the Defendants as follows:

A.  Actual damages in the amount of $375,000;

B.  Additional damages under 15 U.S.C. § 1692k in the amount of $1,000;

C.  Payment of attorneys fees and other costs of this action; and

D.  For such other and further relief as the Court determines appropriate.

## COUNT TWO: VIOLATIONS OF TILA

170.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

171.  The Defendants violated 12 C.F.R. § 226.10 and 226.20(c) by:

(a)  Failing to provide new disclosures from the addition of the unauthorized insurance premiums;

(b)  Failed to provide new disclosures from the addition of the unauthorized other fees that were added to Plaintiff's loan balance.

172.  As a result of the imposition of unauthorized fees, such as false placed insurance, and violations set forth, Plaintiff's mortgage payment have been improperly adjusted between the interest and principal therefore causing the loan balance to be higher than it would have been but for the improper charges.

173.  Plaintiff have either paid such fees and excessive interest or had their property encumbered by such fees and interest.

174.  Plaintiff are entitled to relief under 15 U.S.C. § 1640 (a) (1) (A) for actual damages in the amount of $18,000 in addition to statutory damages in the amount of $2,000.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in favor of Plaintiff against the defendants as follows:

A.  Statutory damages in the amount of $2,000;

B.  Actual damages in an amount equal to (i) all increased interest assessed without prior notice and (ii) full credit for all payments made that were assessed and unauthorized escrow fees that were not refunded.

C.  Payment of Plaintiff attorney fees and other costs of this action and

D.  For such other and further relief as the Court determines appropriate.

## COUNT THREE: VIOLATION OF THE RESPA

175.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

176.  The Defendants violated RESPA 12 U.S.C. §2605 and § 2609 by:

(a)  Failing to meet the requirements of 12 U.S.C. §2605 regarding transfer of servicing and responding to qualified written requests;

(b)  Failing to meet the requirements of 12 U.S.C. §2609 regarding escrow account statements, collection of escrow and notification of shortage in escrow account;

(c)  Over escrowing

177.  As a result of the imposition of late fees, the failure to respond timely to qualified written requests, and mismanagement of the escrow account, Plaintiff's mortgage loan balance was to higher than it would have been but for the improper charges and Plaintiff had to spend time away from employment to contact mortgage servicer and calculate actual mortgage balance

and incurred attorneys fees for which Plaintiff seeks actual damages in the amount of $18,000, in addition to additional damages in the amount of $2,000.

WHEREFORE, Plaintiff respectfully that the judgment be entered in favor of the Plaintiff against the Defendants as follows:

A.  Actual damages in the amount of $18,000.

B.  Additional damages under 12 U.S.C. § 2605 (f)(1)(b) in the amount of $2,000;

C.  Payment of attorney's fees and other costs of this action; and

D.  For such other and further relief as the Court determines appropriate.

## COUNT FOUR: BREACH OF CONTRACT

178.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

179.  The Defendants violated the provisions of the Note and Mortgage by:

(a)  Misapplying the monthly payments;

(b)  Imposing bogus and unauthorized valuation expenses and property inspection fees;

(c)  Charging unauthorized escrow fees;

(d)  Wrongfully accelerating the mortgage;

(e)  Failing to refund the escrow portion that was added to the monthly payments for the unauthorized force-placed insurance after it was refunded.

(f)  Failing to perform under the TPP Agreement (LITTON)

180.  As a result Plaintiff has been damaged by such violations, property has been encumbered, foreclosure proceedings initiated, has been overcharged interest, and lost profits and business.

181.  These acts were done in a willful and wanton manner because Defendants had been notified by Plaintiff and they continued to charge and impose their fees.  Plaintiff has not failed to perform the covenants and agreements contained in the Security Agreement to authorize fees charged.

182.  Plaintiff accepted LITTON's TPP offer by making required payments and providing requested documentation.  LITTON received benefits from entering into the TPP Agreement. Plaintiff gave up the ability to pursue other means of saving their home and became in further arrears than they would have been otherwise.  LITTON imposed improper fees and costs on Plaintiff during and after the Trial Period.

WHEREFORE, Plaintiff respectfully request that judgment be entered in favor of the Plaintiff against the Defendants as follows:

A.  Actual damages in the amount of $25,000;

B.  Punitive damages;

C.  Lost Profits and future earnings;

D.  Payment of Plaintiff's attorney fees and other costs of this action; and

E.  For such and further relief as the Court determines appropriate

## COUNT FIVE: BREACH OF FIDUCIARY DUTY

183.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

184.  The Defendants breached their fiduciary duty to Plaintiff by:

(a)  Charging excessive forced-placed insurance premiums and finance charges to their escrow account

31

185. As a result Plaintiff has been damaged by such breach, property been encumbered,

foreclosure proceedings initiated, have been overcharged interest, and lost profits and business.

WHEREFORE, Plaintiff respectfully request that judgment be entered in favor of the

Plaintiff against the Defendants as follows:


A. Actual damages in the amount of $20,000;

B. Punitive damages;

C. Lost Profits and future earnings;

D. Payment of Plaintiff's attorney fees and other costs of this action; and

E. For such and further relief as the Court determines appropriate

## COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

186. Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

187. Defendants sent Plaintiff several letters of foreclosure accelerating the mortgage,

requesting large sums of money for fees, late charges, interest, and escrow to prevent further

action.

188. The Defendants were/are the lien holder of the mortgage and had/have the power to

assert a foreclosure at any time they may feel insecure.

189. The Defendants knew or should have known that their conduct would inflict severe

emotional distress or know that there is a high probability that the conduct would by wrongfully

accelerating the mortgage.

190. At the time and place aforesaid, the Defendants knew or should have known of the

stress that it caused because the Plaintiff made several attempts on behalf of themselves and

through their attorney to communicate the hardship that had been placed on the Plaintiff's mental, emotional and financial situation.

191.   At the time and place aforesaid, the Defendants committed on or more of the following acts:

(a)  Their conduct was extreme and outrageous for accelerating the mortgage and trying to collect payments and fees not legally due and owing;

(b)  Their conduct intentional in that defendants sent proof that proved that they were not legally due and owing for alleged payments and the Defendants still continued their collection efforts;

(b)  Plaintiff suffered severe emotional distress in that they (i) lost business due to the time and effort put into the stress and worry of foreclosure (ii) are in constant fear of losing the home (iii) their credit was ruined

192.   As a proximate result of one or more of these intentional acts, Plaintiff have suffered severe and extreme emotional distress.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in favor of the Plaintiff and against the Defendants for a sum in excess of the jurisdictional limit of this court.

## COUNT SEVEN: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

193.   Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

194.   Each of the following is an "enterprise" as defined in 18 U.S.C. § 1961 (4):

(a)  POPULAR

(b)  LITTON

(c)  OCWEN

(d)  THE BANK OF NEW YORK

(e)  WiLMINGTON FINANCE

195.  The activities of the enterprises affect interstate commerce.  LITTON is in Texas, Ocwen is in Florida and the Plaintiff resides in Pennsylvania.

196.  The Defendants devised and implanted a scheme to defraud the Plaintiff by imposing unauthorized forced placed insurance fees/escrow fees/ and or foreclosure property inspection fees causing the loan payments Plaintiff made to be misapplied therefore causing an appearance of a default when none existed.

197.  As a result the monthly mortgage payments were improperly allocated between interest charges and principal reduction that was represented on the statements that were sent in the mail and/or fax to the Plaintiff.

198.  The unauthorized and bogus corporate advance fees, escrow fees, and inspection fees were added to statements sent to Plaintiff in the mail between 8/16/05 and 6/1/12.

199.  This scheme constitutes a scheme or artifice to defraud within the meaning of the federal mail and wire fraud statutes, 18 U.S.C. §§1341 and 1343.

200.  The mails and wires were used in furtherance of the scheme, in that

(a)  The reinstatement quotes itemized these fees.

(b)  The Plaintiff has either paid such fees, and/or had their property encumbered by such fees which are incorporated into the total indebtedness secured by the property by continuing to pay the mortgage via the U.S. Mail and/or wire.

201.  The Defendants thereby violated 18 U.S.C §1962 (c)

202.  Plaintiff was injured in their business and property by reason of this violation, in that:

34

(a) Had their property encumbered by such fees and unauthorized charges;

(b) Paid the charges;

(c) Lost profits and future earnings;

(d) Home has been wrongfully put into foreclosure action;

(e) Paid and bees assessed excessive interest

WHEREFORE, Plaintiff respectfully request that judgment be entered in favor of the

Plaintiff against the Defendants as follows:

A. Damages in the amount of $25,000;

B. Statutory damages 18 U.S.C. 1341, Section 1343 in the amount of $1,000,000;

C. Payment of Plaintiff's attorney fees and other costs of this action; and

D. For such other and further relief as the Court deems just and proper.


## COUNT 8 - FEDERAL MORTGAGE FRAUD

### FRAUD FOR PROFIT

203.  Plaintiff re-allege and incorporate by reference all preceding allegations of law and fact.

204.  Fraud for Profit:  One of the two (2) types of Mortgage Fraud recognized by Federal

Law.  When a lender, broker or other real estate professional commits mortgage fraud, it is called

Fraud for Profit because the primary intent is to make money unlawfully.  Examples of this may

include omitting or falsifying information submitted by the borrower to "seal the deal".  This is

the case herein.  *See Exhibit 34 - The Deed filed on or about June 20, 2005, in this matter.*   The

Deed is signed by the Grantors, MISAIL PAPADOPOULOS and EVANGELIA

PAPADOPOULOS, by their Agent ALEXANDER PAPADOPOULOS, and GEORGIOS

KEHAGIAS and VASILIA KEHAGIAS, husband and wife. However, there is no proper

Certificate of Residence signed or submitted by the Grantee, ANTHONY PAPAPIETRO. On Page 4 of said Deed, there is a small statement and signature line on the bottom of the page, stating "the Undersigned hereby certifies that the address of the within named Grantee is 48 Orange Avenue, Staten Island, NY 10302", with a signature underlined "on behalf of the Grantee". Plaintiff in this matter, ANTHONY PAPAPIETRO, who is the Grantee in the Deed, did not sign this document, nor was he represented by counsel or anyone else that could sign on his behalf. Plaintiff does not know whose signature this is and who signed it on his behalf. This is a prime example of Fraud for Profit and falsifying information of the borrower:

   -All deeds must include a "Certificate of Residence" in order to meet Pennsylvania recording requirements. The Certificate of Residence must be signed by the grantee, or someone that it appointed to sign on their behalf, setting forth the precise residence of the grantee. The Certificate of Residence will be recorded with the deed.

   WHEREFORE, the Plaintiff, ANTHONY PAPAPIETRO, requests that judgment be granted in favor of Plaintiff and against the Defendants for a sum in excess of the jurisdictional limit of this Court.


<u>**SUMMARY**</u>

   205. The Defendants led me to believe that they were willing to work with me to come to mutually convenient agreement and arrangement, but that was not the case. The seriousness of the distress that has been put on my family, I cannot begin to describe. The BANK OF NEW YORK and JPMORGAN CHASE, along with the Servicing Companies have lost many lawsuits against defendants for similar mortgage fraud and have been fined billions of dollars.

206.  The Defendants in this action have been made to settle with hundreds if not thousands of borrowers by the Courts.  However, they still continue these deceptive practices and illegal actions against borrowers, borrowers who are real people living and working to achieve the "American Dream".  Real humans for whom this dream has been stolen by these Servicing Companies and Banks by misleading and committing fraud against such people. I believe that this Honorable Court can "tip the scales" of Justice in the favor of hard working Americans, such as myself, the Plaintiff, ANTHONY PAPAPIETRO.

## DEMAND FOR A JURY TRIAL

207.  Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that they recover the following

Actual damages according to proof;

(A)  Statutory damages and penalties;

(B)  Prejudgment interest at maximum rate;

(C)  Damages to credit reputation;

(D)  Expense of litigation, including attorneys' fees;

(E)  Punitive damages;

(F)  Such other damages as are appropriate in this case;

(G)  For a trial by Jury.

**WHEREFORE**, the Plaintiff asks this Honorable court to grant the relief requested herein and for such other and further relief as the Court may deem just and proper.

Dated:  Staten Island, NY
        October 4, 2022

*Respectfully Submitted,*

ANTHONY PAPAPIETRO
Plaintiff, Pro Se
48 Orange Avenue
Staten Island, NY  10302
(718) 448-3971

38

# PRIORITY
# MAIL

®

**PRIORITY MAIL**
**POSTAGE REQUIRED**



**UNITED STATES POSTAL SERVICE** ® **Click-N-Ship**®

usps.com   9405 5036 9930 0369 4695 54 0102 0000 0021 85
**$10.20**
US POSTAGE
Legal Flat Rt Env   **U.S. POSTAGE PAID**

10/12/2022          Mailed from 10302   986780037588177

## PRIORITY MAIL®

ANTHONY PAPAPIETRO                Expected Delivery Date: 10/14/22
48 ORANGE AVE
STATEN ISLAND NY 10305-2036   RECEIVED            **0000**
                                SCRANTON

                                OCT 17 2022         **C770**

PER _____ *dw*
              DEPUTY CLERK

U.S. DISTRICT COURT  MIDDLE DISTRICT OF
235 N WASHINGTON AVE   *PO Box 1148*
SCRANTON PA 18501-5001

## USPS TRACKING #

**9405 5036 9930 0369 4695 54**

Electronic Rate Approved #038555749

# VISIT US AT USPS.COM®
## ORDER FREE SUPPLIES ONLINE